In re DRAKE.

(District Court, D. South Carolina. March 24, 1902.)

INVOLUNTARY BANKRUPTCY—PERSONS ENGAGED CHIEFLY IN FARMING.

On an issue whether defendant was "engaged chiefly in farming," within Bankr. Act, § 4, excepting such persons from proceedings in involuntary bankruptcy, it was shown that the stationery used by him in ordering merchandise had the words "Merchant and Planter" at its top, and a traveling salesman testified that in outward appearance, etc., defendant's place of business did not differ from an ordinary country store. The bankrupt showed that he lived about 10 miles from town; that he had several large plantations under cultivation; that about one third of the land was worked by hired labor, another third on shares, and the remaining third let for a stipulated rental, defendant reserving the general control; that he bought all the fertilizers and provided the plantation supplies, and for that purpose kept what he called a "little commissary," selling a few goods to outside parties. It appeared that he and his brother had been engaged in a mercantile business on the same premises some time before, which ended in failure, etc. In explanation of the printed letter heads, defendant said he thought they "looked nice." A bank president testified that he loaned defendant about $5,000 per year for his farming business and nothing for his mercantile business, and that he regarded him as engaged chiefly in farming. Merchants testified to selling him goods for family use. His neighbors testified that they regarded him as engaged chiefly in farming, etc. *Held*, that defendant was not subject to involuntary bankruptcy.

In Bankruptcy.

Willcox & Willcox, for petitioners.

Knox Livingston, for respondent.

BRAWLEY, District Judge. The only question in this case is whether J. N. Drake is a person "engaged chiefly in farming," which the answer sets up as a defense against the petition in involuntary bankruptcy, alleging the making of a general assignment that is not denied. On the part of petitioners requisite in number and amount of claims it is proved that the stationery used in ordering merchandise had the words, "J. N. Drake, Merchant and Planter," printed and stamped at the top of the page; and a traveling salesman for one of the largest creditors testifies that he visited the premises where the mercantile business was conducted, and that in all outward appearance and in the character of the goods therein it did not differ from what is ordinarily known as a country store; that the building was filled with counters and shelves and an iron safe, and therein differed from the class of buildings known in the country as "commissaries," wherein, according to the custom proved, the larger planters keep the supplies for their own plantations. On the part of the alleged bankrupt it is proved that he lived about 10 miles from Bennettsville, in the county of Marlboro; that in the year 1891 he had under cultivation Argyle plantation, containing 350 acres, the Covington place, containing 225 acres, and the Lane tract, containing 85 acres, the title to all of which was in his name, and a tract of 450 acres, the title to which was in his children; that his expectation that year was to raise 600 bales of cotton upon these lands, but, owing to the bad season, the lands produced only about 300 bales, and the testimony

makes it clear that a like disaster attended all the farming operations in that section of the state during that year.    J. N. Drake testifies: That he and his brother conducted a mercantile business about 18 years ago upon the premises described, which ended in failure.    That thereafter he, in partnership with a brother, was in a mercantile business at a point about two miles distant, which firm was dissolved in the year 1899; and that during the years 1900 and 1901 he was engaged chiefly in farming, and was not engaged in any mercantile business, except in connection with his farming operations, which were conducted substantially as follows:    About one-third of the land was cultivated with hired labor, at stipulated wages.    About one-third of it was farmed upon shares of the crop.    In some cases he furnished all of the commercial fertilizers, and fed the stock, giving to the laborers one-third of the crop.    In some cases, where the laborers were to furnish one-half of the fertilizers and the stock, they received one-half the crop.    About one-third of the land was let for a stipulated rental; but by contract he had the general control, direction, and management of all the lands cultivated, as well of that for which he was to receive a stipulated rental as of that wherein he employed the laborers at fixed wages.    He bought all of the fertilizers for all of the lands, and provided the plantation supplies for all of the laborers and tenants, and for this purpose kept what he calls a "little commissary"; these supplies being kept at the place and in the storehouse where he and his brothers, as already described, had formerly carried on a country store.    He says that this was for the convenience and benefit of his farming interests, and for supplying his own hands and tenants, and that, although he sold a few goods to others for cash, whenever parties called for them, he did not advertise or otherwise solicit business; that all of the fertilizers bought were used upon his farm, except a small portion, which he let his brother have; and that the groceries and other goods were supplied to the laborers and hands employed upon his farms, it being the custom of the country, and necessary to the conduct of farming operations upon any large scale, for the landowner to keep on hand and supply the laborers with such groceries and other articles of merchandise as were required.    In explanation of the printed letter heads, he said he thought it "looked nice."    The president of the bank at Bennettsville with which Drake did business testifies that for several years he had loaned him about $5,000 per annum for the conduct of his farming operations, taking liens on his crops; that he did not lend him any money for conducting any mercantile business; that he regarded him as chiefly engaged in farming, and the other business was an appendage to his farming, the store which he designated as a "commissary" being for the purpose of supplying the persons employed on his farms. Merchants at Bennettsville testify to selling him general merchandise for his family use.    His neighbors all testify that they regarded him as chiefly engaged in farming, and that the store described was kept for the purpose of supplying his hands.    All of the witnesses concur in saying that, by the custom of the country, a store or "commissary," as they call it, was kept by all farmers or planters for the purpose of furnishing supplies to their laborers whenever the farming

operations required the employment of any considerable amount of labor; that this practice had grown up out of the necessities of their situation, and enabled them the better to control the labor, and to prevent their men from going off to the neighboring towns to secure the supplies necessary to the plantation; the greater the distance from the towns, the greater being the necessity for such stores. The contention of the petitioners is that, as to so much of the land as was not cultivated by Drake personally, he could not be said to be engaged in farming; that his relation to it was simply that of landlord, and that his tenants were the farmers. The testimony of Drake, which has not been contradicted, is that he exercised supervision, control, and management of all the labor employed upon all of his lands.

The supreme court of this state, in Carpenter v. Strickland, 20 S. C. 1, held that a person employed to cultivate the land of another, and who received for his services one-half of the crop produced, was a laborer, and, under the statute, could not give a lien upon the crop. It is suggested, too, that there is a distinction between a "planter" such as Drake describes himself in his letter heads and a "farmer," and that the word "farming" in the statute should be given a restricted meaning, and applies only to those actually working on the land. The precise words of the act are (section 4): "Any natural person, except a wage-earner, or a person engaged chiefly in farming or the tillage of the soil, * * * may be adjudged an involuntary bankrupt," etc. 30 Stat. 547. There was a well-marked distinction in South Carolina anterior to the war between the states between a planter and a farmer, but the distinction has disappeared with the social and economic conditions which produced it, and for the purposes of this case it would be as idle to discuss it as the social conditions in Judea described by St. Matthew when those bidden to the marriage of the king's son "made light of it, and went their ways; one to his farm, another to his merchandise." Nor will it profit to trace historically the meaning of the word "farming." In its purely agricultural sense, its use is comparatively modern. Within the purview of this statute it is understood to mean the business of cultivating land, or employing it for the purposes of husbandry; and a farm is a tract devoted to cultivation under a single control, whether it be large or small, isolated, or made up of many parcels. For a long time after the words began to be used in an agricultural sense, they were applied to lands held on lease, and "demise, lease, and to farm let" are still the operative words of a lease, but they are, in modern use, applied without respect to nature of tenure. Robinson Crusoe says, "I farmed upon my own land," so it appears that the words have been used in their present sense for nearly 200 years. Under the proofs in this case the defendant had the direction and control of the farming operations upon all of the land described, and was "engaged in farming," and I am of opinion that these words cannot be given the restricted meaning which would take out of the protection of the statute only those engaged in actual labor upon the farm. "Wage-earners" are excepted, and, if it was intended to except only the agricultural laborer, the words "tiller of the soil," or some other

apt expression, would have been employed. When the bankrupt act excepts from its operation persons "engaged chiefly in farming or the tillage of the soil," due effect must be given to the words. The act defines "wage-earner" as an "individual who works for wages, salary, or hire, at a rate of compensation not exceeding one thousand five hundred dollars per year," and, if the intent was to limit the protection of persons engaged in agricultural pursuits to those only who were farming upon a small scale, it could easily have been done. It may be difficult to find a good reason why this defendant should be protected from the consequences of an act which, in every other class, would entail adjudication in bankruptcy; but it is not for the courts to vindicate the wisdom of laws which it is their duty to administer. If he is "engaged chiefly in farming," he cannot be adjudicated a bankrupt in an involuntary proceeding, and the test must be whether his chief occupation—the pursuit from which he expects to derive his support and profit—is farming or some other. The testimony leaves little room for question on that point. Although his purchases of merchandise were large, amounting to fifteen or twenty thousand dollars, a large part of this was for commercial fertilizers used upon the land. The remainder, he says, was sold to his laborers, etc., at a profit, which he says was small, owing to the competition of neighboring stores. His time was mainly devoted to the management and supervision of the farming operations, while the store was in charge of his nephew, a youth of 17 or 18 years. It might require a nice calculation to determine whether the profits from his farming were greater than the profits on the merchandise, but there is nothing in the testimony which would lead to any correct conclusion on that point. It appears that, owing to the disastrous season, there were no profits from any source, and that nearly $5,000 of advances to persons engaged on the farms remains unpaid. That he regarded his mercantile business as an incident to his farming operations; that he made no attempt to extend it, and devoted his time and energies to his farms, and looked to them mainly for his profits,—seems to be clear. If so, it would follow that he is a "person engaged chiefly in farming," and the petition must, therefore, be dismissed.

Inasmuch as the petitioners were doubtless misled as to the nature of the defendant's business by the letter heads which he used, it is considered that he is not entitled to recover costs from them.